STANLEY GOFF (Bar No. 289564)
15 Boardman Place Suite 2
San Francisco, CA 94103
Telephone: (415) 571-9570
Email: scraiggoff@aol.com
'

Attorney for Plaintiffs

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| KATHRYN R. WADE, et al, | ) **CASE: 3:25-cv-03200-TSH** |
| Plaintiff, | ) **FIRST AMENDED COMPLAINT** |
| v. | ) |
| CITY OF ANTIOCH, et al., | ) |
| Defendants. | ) |

# I. PARTIES

1. Plaintiff Kathryn Wade was at all times relevant to this complaint, living within the Northern District of California. Wade is African American.

2. Plaintiff S.B., A MINOR BY AND THROUGH HIS GUARDIAN AD LITEM and child of decedent Malad Baldwin who was at all times relevant to this complaint, living within the Northern District of California and is a co-successor-in-interest to decedent.

3. Plaintiff China Young was at all times relevant to this complaint, living within the Northern District of California. Young is African American.

4. Plaintiff Adrian Arroyo was at all times relevant to this complaint, living within the Northern District of California. Arroyo is Hispanic.

5. Plaintiff Brandon Lopez was at all times relevant to this complaint, living within the Northern District of California. Lopez is Hispanic

6. Defendant City of ANTIOCH is a municipal corporation, duly organized and existing under the laws of the State of California and is the employer of the Chief of Police of the Antioch Police Department, and of the to-be-identified individual officers, sergeants, and employees who carried out the acts and omissions complained of herein.

7. At all material times, the City of ANTIOCH was responsible for supervising, enacting, and enforcing ANTIOCH POLICE DEPARTMENT (APD) conduct, policies, and practices; the absence of needed policies and practices; and for the hiring, retention, supervision, and training of employees and agents of APD.

8. Defendant DEVON WENGER was employed as a police officer for the City of Antioch at the time of the incident in question. This Defendant is being sued in his individual capacity.

9. Defendant ERIC ALLEN ROMBOUGH was employed as a police officer for the City of Antioch at the time of the incident in question. This Defendant is being sued in his/her individual capacity.

10. Defendant MORTEZA AMIRI was employed as a police officer for the City of Antioch at the time of the incident in question. This Defendant is being sued in his/her individual capacity.

11. Defendant JACOB EWART was employed as a police officer for the City of Antioch at the time of the incident in question. This Defendant is being sued in his/her individual capacity. Ewart was one of the officers on a text chain making racist remarks against the Black citizens of Antioch. In September 2019, he was part of a text chain in which an Antioch police officer sent the following image of a white female cartoon character pointing her finger to the phrase "This NIGGA":



In May 2020, Ewart received another racist text message from an Antioch police sergeant with the following picture, again using the N-word:

> They tripin they let the k9 bite two niggas any body that was standing on pep inna van from nigggas to bitches I got the fuck outta there
>
> Stay inside

And in June 2020, another officer texted Ewart and other Antioch police officers, including sergeants and detectives, stating, "I'll buy someone a prime rib dinner at House of prim rib to 40 that mfr during the protest today." The text was a reference to using a weapon on former Antioch Mayor Lamar Thorpe, who is African American.

12. Defendant MICHAEL MELLONE was employed as a police officer for the City of Antioch at the time of the incident in question. This Defendant is being sued in his/her individual capacity. After an initial period of employment as a police officer with the Antioch Police Department from November 2006 to May 2012, Defendant Michael Mellone rejoined the Antioch Police Department in August 2019 and, at all relevant times, was acting within the course and scope of that employment. Mellone was rehired by Antioch days after resigning from the San Francisco Police Department while facing discipline for needlessly escalating a confrontation that led to the fatal police shooting of an unhoused Mexican immigrant experiencing a mental health crisis. Mellone was one of the officers responsible for the killing of Luis Góngora Pat in April 2016, who was shot by officers at least four times.

13. The true names and capacities, whether individual, corporate, associate or otherwise, of defendants Does 1 through 50 inclusive, are unknown to the plaintiffs, who therefore sue said defendants by such fictitious names. Defendants DOES 1 through 50, and each of them, were responsible in some manner for the injuries and damages alleged herein. Plaintiffs are informed and believe and thereupon alleges that each of them is responsible for the injuries and damages alleged herein. These DOES 1-50 will be named as defendants in this action once their identities are ascertained, and they are being sued in their individual capacities.

14. All defendants acted under the color of law as it pertains to this complaint.

## II. JURISDICTION AND VENUE

15. This action is brought pursuant to 42 U.S.C. §§ 1983, 1988 and 12132 and the Fourth and Fourteenth Amendments to the United States Constitution, made applicable to Defendants through the Fourteenth Amendment to the United States Constitution. This Court has jurisdiction over plaintiffs' claims under 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a).

16. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because the events giving rise to this action occurred in Contra Costa County, which is in the Northern District.

**FACTUAL ALLEGATIONS**

17. While employed at APD, all named Defendants conspired and agreed together and with each other, and with others unknown at this time to injure, oppress, threaten, and intimidate residents of Antioch, California in the free exercise and enjoyment of rights secured to them by the Constitution or laws of the United States. They specifically made racist and demeaning statements about African American residents of Antioch. Defendants intentionally and with malice engaged in the willful use of unreasonable force, and purposefully denied equal protection under the law, to residents of the city they were entrusted to protect.

18. These civil rights violations included assaults, beatings, false arrests, unreasonable searches and seizures, intimidation, falsifying reports, denial of equal protection, and racial discrimination.  This misconduct included targeting Black people living in Antioch neighborhoods with disparate treatment because of their race.  A police presentation at an April 2023 Antioch City Council meeting showed striking disparities in arrest practices between Black and White residents of the City of Antioch:  despite being less than a fifth of the population (19.5%) in 2022, Black residents constituted 46% of APD's 2022 arrests (692 arrest of Black residents), more than any other demographic.

19. An expert in U.S. racial history and politics and human-animal studies Dr. Claire Jean Kim (Ph.D., of the University of California, Irvine) recently opined in *People v. Pugh*, Case No. 1-197638-0 in the Superior Court of California for the County of Contra Costa, about the APD's racist text messages.  She concluded that the APD exhibited a systemic culture of racism and racist animus—that is to say, the APD's racism was *not* confined to the individuals in the text threads: "The fact that there were supervisors included in these text exchanges, and that one officer remarked the N-word was 'commonly used around the PD,' including by supervisors, indicates that this is not just a matter of a 'few bad apples' in the Antioch Police Department.

The problem of racial bias and animus is systemic in the department and requires a correspondingly systemic response from the court."

20. Tammany Brooks, who was APD's Chief of Police from May 2017 through October 2021, told the Antioch City Council that he personally reviewed all complaints filed with the APD before forwarding them to either internal affairs or a supervisor.

21. Lamar Hernandez-Thorpe, the former mayor of the City of Antioch, stated in or about March 2023 about the APD, "We're not going to pretend that we have a few issues with a few bad apples. It is clear we have cultural and systemic problems that persist to this very day.

**KATHRYN WADE AND MALAD BALDWIN**

22. Defendants Mellone and Ewart, acting individually or in concert with one another and other Antioch police officers, engaged in a repeated pattern and practice of civil rights violations and other misconduct against citizens living in City of Antioch neighborhoods, in particular against Plaintiff KATHRYN WADE and her late son, MALAD BALDWIN.
*The City of Antioch's police officers abused Plaintiff and her son because they were Black and spoke out about police misconduct.*

**23. The first 2019 attack.** In or about September 2019, Antioch police officers violently attacked Plaintiff's son in front of their house for no lawful reason. Antioch police officers followed Mr. Baldwin into the home and started beating him inside. Antioch police officers beat Mr. Baldwin so severely that they had to transport him to Sutter Delta Hospital to treat his injuries.

7

**24.** Plaintiff arrived home after the police officers had already taken Mr. Baldwin away and learned that the officers had again attacked her son. The police officer at the scene, Jason Vanderpool, told Plaintiff that her son was arrested but did not tell her that the police officers had beaten him and then transported him to the hospital. The police officer also concocted a false story about Mr. Baldwin to cover up the brutal actions. Plaintiff later learned that Mr. Baldwin asked to call his mother from the hospital but was refused the opportunity to do so. When Plaintiff was finally able to see her son days after the incident, he was still bruised throughout his body, including on the inside of his legs.

**25. The second 2019 attack.** In or about December 2019, Mr. Baldwin again was violently attacked by Antioch police officers while walking on the street alone. Plaintiff believes this incident was the result of further targeting of Baldwin as part of the larger pattern of disparate policing, unequal treatment, and civil rights violations committed by Antioch police officers and enabled by Antioch's policies. An Antioch police officer falsely claimed that Mr. Baldwin had a gun, and several officers jumped him on that false pretense. Plaintiff learned about this incident when another Antioch police officer called her and apologized for the beating inflicted on her son based on the false assertion that he had a gun.

**26. The 2020 confrontation**. In or about February 2020, Plaintiff and her son were accosted by Antioch police officers while visiting a local Wal-Mart. Without any justification, an Antioch police officer pointed a gun at Mr. Baldwin's head and at Plaintiff while they were sitting in a parked vehicle in the Wal-Mart parking lot. At one point, at least six Antioch police officers surrounded Plaintiff and Mr. Baldwin. Antioch police officers also handcuffed a third person who had accompanied Plaintiff and Mr. Baldwin to Wal-Mart. After threatening them both with a gun, handcuffing their companion, and violating their civil rights, the Antioch police officers let Plaintiff, Mr. Baldwin, and their companion leave the parking lot. Neither Plaintiff, her son, nor their companion was charged with any offense.

**27. The 2020 beating.** In or about March 2020, Baldwin was again brutally beaten by Antioch police officers, including Defendant Mellone, in connection with an arrest. After beating him, the Antioch police officers transported him to Sutter Delta Hospital. Plaintiff is informed and believes that Mellone and the other Antioch police officers knew who Mr. Baldwin was, based on their long history of harassing and assaulting him. But they nevertheless feigned ignorance and had him admitted to Sutter Delta as a John Doe.

28. After that incident, Plaintiff did not hear from her son for two days. Afraid, worried, and unable to sleep, she desperately tried to locate him by calling hospitals and the jail, but because the Antioch police officers had admitted him as a John Doe, she could not locate her son. When she finally saw him days later, his head was puffy, bruised, and had stitches. Plaintiff also learned that the Antioch police officers had shot at him.

9

29. Plaintiff also learned from Mr. Baldwin that while he was in a police vehicle after being assaulted and arrested, officers in the vehicle jeered "so monkeys can run, huh?".

30. In these and other interactions with Antioch police officers, Mr. Baldwin sustained physical injuries, and his mental condition deteriorated.  The targeting and violence inflicted on Mr. Baldwin by Antioch police officers, including Defendant Mellone, also caused Plaintiff to suffer repeated shock, trauma, and emotional distress.

31. The callous and disdainful attitude of the Antioch Police Department also caused Plaintiff repeated shock, trauma, and emotional distress.  For example, when Plaintiff confronted Captain Tony Moorfield, who became Acting Police Chief, about Antioch police officer shooting at Mr. Baldwin during the incident in or around March 2020, Captain Moorfield brushed her aside, saying her son "didn't die."

32. In addition to the brutal attacks they perpetrated on Mr. Baldwin and Plaintiff, Antioch police officers refused to help Mr. Baldwin when he experienced medical emergencies. On multiple occasions, Plaintiff called 911, seeking assistance for her son for medical emergencies.  Instead of aiding Mr. Baldwin when he needed medical attention, the Antioch Police Department continued its campaign of harassment against Plaintiff and her son.

**32. The first 2020 failure to provide medical assistance**.  In one example, on August 7, 2020, Plaintiff called 911, seeking assistance for her son for a medical emergency.  The APD officers who arrived at Plaintiff's home, including APD Officer James Colley, refused to get Mr. Baldwin medical assistance.  After the other APD officers left, APD Officer Colley and another APD officer loitered around Plaintiff's house for no apparent reason other than to harass Plaintiff.

10

**33. The second 2020 failure to provide medical assistance.** In another example, on December 30, 2020, Plaintiff requested medical help because her son was sick and suffering a mental breakdown. The Antioch dispatch sent three police officers to Plaintiff's home. When the officers arrived, Plaintiff explained that Mr. Baldwin needed to go to the hospital because of his health condition. Instead of helping to stabilize and transport Mr. Baldwin to get necessary care, the police officers quarreled with Plaintiff. The Antioch police officers eventually left Plaintiff's home, refused to provide assistance, and canceled the medical call.

*Defendants took advantage of a medical emergency to illegally search Plaintiff's home.*

34. On March 11, 2021, Plaintiff was at home with Mr. Baldwin. He was in his room when Plaintiff heard him yelling that he was sick. Plaintiff saw her son writhing in pain, and she smelled vomit in his room. Plaintiff was immediately scared for her son's condition. Plaintiff called 911 and told dispatch that they needed an ambulance to come to their home to help her son. Plaintiff identified her son by name and advised dispatch that he was having a medical emergency and needed help.

35. A dispatcher told Plaintiff that police would be sent to the home because Plaintiff "was hysterical." Plaintiff told dispatch not to send the police because her son had been violently assaulted by members of the Antioch Police Department in 2014, 2019, and 2020, because the police had previously refused to assist her son when he was experiencing a medical emergency, and because it was purely a medical emergency.

36. When the Contra Costa Fire Department EMTs arrived at her home, Plaintiff opened the door and invited them in. The EMTs followed Plaintiff up the stairs, to where her son was lying on the floor in the doorway of his room. To give the EMTs space to treat her son, Plaintiff then went back downstairs.

37. Although Plaintiff had specifically requested that the police not be sent to her house, three police officers, including Defendants Mellone and Ewart, appeared at the scene and entered Plaintiff's house without a warrant, and without Plaintiff's knowledge or consent.

38. Plaintiff did not give permission to Defendants Mellone, Ewart, or any other Antioch police officer to enter her house. She was not aware that they had entered the house until EMTs brought Mr. Baldwin downstairs on a gurney.

39. After the EMTs carried her son outside of the house, Plaintiff noticed for the first time that Defendant Mellone was in her home without her permission. After Plaintiff heard a loud noise in her house, she went to investigate and saw that Defendant Ewart and a third officer were also in her home without her permission.

40. Mr. Baldwin's room had been clean and orderly when the EMTs and police officers arrived, but it did not stay that way. After the EMTs took Plaintiff's son out of the house on the gurney, Plaintiff saw Antioch police officers upstairs, rummaging in her son's bedroom, which was now in disarray. Defendant Ewart was also upstairs outside of Mr. Baldwin's bedroom.

41. Plaintiff's belongings were damaged in the incident. Plaintiff saw an Antioch police officer holding a clear bag and placing items from Mr. Baldwin's dresser into the bag. Plaintiff does not know what was taken from her home or why.

42. Antioch police officers remained in Mr. Baldwin's room conducting a search, even though he had already been removed from the house and transferred into the ambulance. Plaintiff demanded that the police officers leave her house immediately.

43. Defendant Mellone ignored Plaintiff and instructed one of the police officers to go back upstairs to conduct a search. Plaintiff continued to demand that the officers leave the house. Instead of immediately transporting her unconscious son to the hospital, Plaintiff saw the EMTs standing outside the ambulance watching the interaction between Plaintiff and the police officers. It was only after one of the police officers spoke with the EMTs that the ambulance left for the hospital. Plaintiff's son died two days later in the hospital. Although the Antioch Police Department asserted, and the coroner's report belatedly claimed, that Mr. Baldwin committed suicide, Plaintiff saw her son alive at the hospital and does not know the true cause of his death.

***Defendants had flagged Plaintiff, her son, and their associated addresses in APD's internal systems for response by a minimum of three or four police officers.***

44. It was no coincidence that multiple police officers regularly responded to Plaintiff's emergency calls, regardless of how much she begged for police not to be dispatched to her home. Plaintiff recently learned that the exaggerated police response was a direct result of "flags" that were intentionally placed on Plaintiff, her son, and their residential addresses by APD officers in their internal systems.

45. Specifically, APD flagged for a minimum of three officers to respond to her address purportedly because Plaintiff "is hostile with PD" and is the "mother of Malad Baldwin." APD also created multiple alerts for a minimum of four officers to respond to calls relating to her son, Malad Baldwin, purportedly based on his history with police. These alerts on Mr. Baldwin were instituted at least partially by or at the direction of Defendant Mellone.

***An FBI and Contra Costa County investigation into the Antioch Police Department disclosed racist text messages and civil rights abuses perpetrated by Antioch police officers and the express targeting of Mr. Baldwin.***

46. On April 13, 2023, the Contra Costa District Attorney's Office published, pursuant to a court order in a separate case, redacted versions of text messages among Antioch police officers that substantiated what Plaintiff and her son had experienced: that Antioch Police Department officers maliciously and unfairly targeted and prosecuted Mr. Baldwin, and that their repeated targeting and assault of Mr. Baldwin stemmed from the discriminatory and violent culture of the Antioch Police Department, which Antioch tolerated and condoned.

Plaintiff also learned that years after inflicting a 2014 brutal beating on Mr. Baldwin, Antioch police officers continued to joke about the incident. The Contra Costa District Attorney's report on the officers' text messages revealed the following interaction from June 14, 2020, when the officers discussed the police department's low score on the Police Scorecard, which is the first nationwide evaluation of policing in the United States:

> At 6:15 p.m., APD Sgt. Evans texted APD Officer Amiri, Laughed at "Did the news quote the complaint where it say Colley was beating him about the anus while I held his legs apart?"
>
> At 6:17 p.m., APD Sgt. Jimmy Wisecarver texted, "No there was no mention of the anus.
>
> I'm gonna have to read that report!"
>
> At 6:24 p.m., APD Officer Kelly Inabnett responded, "Apparently they give out grades."
>
> At 6:27 p.m., APD Sgt. Stenger replies, "Damn we failed." …
>
> At 6:28 p.m., APD Sgt. Wisecarver texted, "**Baldwin** was the one providing the grades."
>
> (Emphasis added).
>
> APD Officer Aaron Hughes added, "84% percentile for deadly force."

47. The Contra Costa District Attorney's investigation report stated that the above exchange was a reference to Plaintiff's son, Mr. Baldwin.

**CHINA YOUNG**

48. On October 20, 2019, after watching her sister being arrested by Defendant Devon Wenger, Defendant Wenger without any warning or announcement that he was taking Plaintiff China Young into custody or why he was taking her into custody, rushed toward her and began grabbing at her and slammed the back of her head into a parked car. Wenger then punched China Young several times in the facial area. After China Young was placed in handcuffs, Wenger walked the handcuffed Plaintiff to a patrol car and intentionally slammed her head into the side of the patrol car.

**ADRIAN ARROYO**

49. At about 1:45 a.m. on July 24, 2019, ADRIAN ARROYO an Antioch resident, rode a bicycle along San Jose Drive in Antioch. AMIRI initiated a traffic enforcement stop of ADRIAN ARROYO, specifying later that his bicycle failed to have lights on while it was dark outside. AMIRI ultimately exited his patrol vehicle and ordered ADRIAN ARROYO to stop.

50. In the course of apprehending ADRIAN ARROYO, AMIRI punched him multiple times and his K9 Purcy then bit ADRIAN ARROYO, injuring him.

51. Officer-I, a police officer from a neighboring police department and AMIRI's roommate, was present during this incident in AMIRI's vehicle. AMIRI had scheduled a "ride-along" for DOE Officer-I a day earlier. AMIRI sent numerous individuals a description of the bite and/or photographs of the bite after the incident.

52. For instance, minutes after the bite, at about 1 59 a.m., AMIRI sent a photograph from the incident to DOE Officer-I, who responded "Haha".

53. Less than an hour after the incident, at about 2:41 a.m., AMIRI sent two photographs from the incident to Defendant ROMBOUGH. ROMBOUGH replied, "Yeah buddy good boy purcy".

54. ROMBOUGH later wrote to AMIRI, "Lol you bit [A.A.]" and "Fuck that turd" at about 4:12 p.m.

15

55. At about 5:03 a.m. on July 24, AMIR the following messages to DOE Officer-2:

AMIRI: [DOE Officer-I] helped me get a bike on a ride along just now lol *bite

i took an SUV since he can't fit in my car and i don't have a door pop for this car so he opened my door and sent purcy in for a bite.

DOE Officer-2: Lol nice.

57. At about 8:17 a.m., AMIRI sent DOE Officer-3, a police officer from a neighboring police department, "Purcy #6 …" and a photograph from the incident, and stated the following:

AMIRI: this one was different... i had a lateral ride along (my roommate) and i was driving someone else's car so my door pop wasn't matched up... sooo i had my ride along open my door !! i did not mention that in the report

DOE Officer-3: Wow lol
AMIRI: hey we made it work lo !!
DOE Officer-3: Nice good job What cut the dogs face?
AMIRI: that's a piece of the suspect's flesh lol

58. Shortly thereafter, at about 9:14 a.m., AMIRI exchanged the following messages with his roommate, Officer-1, remarking that the incident was a "weak ass 69" and "stretch of a 69" in reference to California Penal Code 69 (resisting an officer) and explaining how he would get out of "go[ing] to court for the bite":

AMIRI: bro that's was badass. Thanks for your help. You got to see purcy in action lol. That was a weak ass 69 but the bosses were cool with it. Detectives already called PRCS and got him a 45 day violation and we are gonna leave it at that so i don't have to go to court for the bite. Easy

DOE Officer-1: Hahaha anytime !! That was cool..I wanted to help but you know how that goes lol….that's good saves you hella shit having to go through

AMIRI: right! yea it wasn't even really a fight and more of just a resisting and making it a stretch of a 69 lol. I'm sure if he started kicking my ass you'd jump in

59. Following this incident, AMIRI authored a police report that differed from the description AMIRI privately provided to others in his text messages, including that the report made no reference to Officer-1's participation in the deployment of K9 Purcy.

## BRANDON LOPEZ

60. Brandon Lopez was arrested in Nov.2020 and as a result of fabricated evidence provided by Defendant Rombough in his police report, Plaintiff was sentenced to 24 months in federal prison.

61. After 17 months into his sentence an investigation regarding the Antioch texting scandal and other misconduct was related to Rombough was conducted. As a result of this investigation, Plaintiff's case was reviewed by the Contra Costa County District Attorney's office, and it was decided that the District Attorney's office would request that the Plaintiff's case be vacated. Plaintiff was subsequently released from prison after serving 17 months.

**CAUSE OF ACTION**
**(Conspiracy to Violate Civil Rights, 42 U.S.C. § 1983 – 4th , 14th Amendment, by all named Plaintiffs against all named Defendants)**

62. The preceding paragraphs of this complaint are re-alleged and incorporated herein.

63. Beginning on a date unknown, but no later than approximately February 2019 and continuing through approximately April 2022, in the Northern District of California, all named Defendants did knowingly and willfully conspire and agree together and with each other, and with others known and unknown, to injure, oppress, threaten, and intimidate residents of Antioch, California in Northern District of California, including Plaintiffs, in the free exercise and enjoyment of rights secured to them by the Constitution or laws of the United States, to be free from the use of unreasonable force by a law enforcement officer, all in violation of the United States Constitution.

64. Defendants, together and with each other, agreed, orally and in writing, to violate the civil rights of the residents of the City of Antioch, California.

65. Each of the Defendants, did intentionally engage in the use of excessive force against residents of the City of Antioch, including, but not limited to, on Plaintiffs.

Wherefore, Plaintiffs pray for the relief set forth below.

**(Monell Violation by all named Plaintiffs against Defendant CITY OF ANTIOCH and the ANTIOCH POLICE DEPARTMENT and DOES 1-10)**

66. The preceding paragraphs of this complaint are re-alleged and incorporated herein.

67. Defendants acted under color of state law at all times relevant to this complaint;

68. Defendants' acts, as alleged herein, deprived the Plaintiffs of their fourth and fourteenth amendment rights under the Constitution;

69. Chief Tammany Brooks, employed by Defendants CITY OF ANTIOCH and the ANTIOCH POLICE DEPARTMENT, was at all times relevant hereto, together with DOES 1-10, the final policymaker for Defendants CITY OF ANTIOCH and the ANTIOCH POLICE DEPARTMENT, and acted under color of state law;

70. Chief Tammany Brooks and DOES 1-10 had final policymaking authority from Defendants CITY OF ANTIOCH and the ANTIOCH POLICE DEPARTMENT concerning the acts of Defendants;

71. Chief Tammany Brooks, employed by Defendants CITY OF ANTIOCH and the ANTIOCH POLICE DEPARTMENT, together with DOES 1-10 ratified Defendants' acts, as alleged herein, by knowing of Defendants' misconduct against minority residents of the CITY OF ANTIOCH and specifically made a deliberate choice to approve such Defendants' actions;

72. Chief Tammany Brooks, employed by Defendants CITY OF ANTIOCH and the ANTIOCH POLICE DEPARTMENT, together with DOES 1-10 refused to take any action to prevent Defendants from depriving Plaintiffs' rights, despite knowing, or

reasonably should have known, that Defendants were intentionally using excessive force against residents of the CITY OF ANTIOCH, in particular, minority residents.

73. The actions/inactions of Chief Tammany Brooks, employed by Defendants CITY OF ANTIOCH and the ANTIOCH POLICE DEPARTMENT, together with DOES 1-10 were so closely related to the deprivation of the Plaintiffs' rights as to be the moving force that caused their ultimate injuries.

Wherefore, Plaintiffs pray for the relief set forth below.

### V. PRAYER FOR RELIEF

Plaintiffs pray for judgment against defendants as follows:

1. For compensatory damages and other special damages according to proof;
2. For general damages according to proof;
3. For punitive damages against all individual defendants according to proof;
4. The prejudgment interest at the legal rate according to proof;
5. For costs and reasonable attorneys' fees as provided by law; and
6. For such other relief as the Court may deem fit and proper.

### VI. JURY DEMAND

Plaintiffs demand a jury trial in this action.

Dated: August 20, 2025

                                    LAW OFFICE OF STANLEY GOFF

                                    */s/ STANLEY GOFF*
                                    STANLEY GOFF